### Case No. 803.

#### BALDWIN v. ROSSEAU et al.

[1 N. Y. Leg. Obs. 391.]

Circuit Court, S. D. New York. 1843.

BANKRUPTCY—TRADING—ACT OF BANKRUPTCY—PREFERENCE.

1. R. and E. for several years were engaged in the business of planing and dressing deals, principally for other persons, but until the close of the navigation of 1841, they had been in the habit of purchasing, manufacturing and selling on their own account; subsequent to that time, with the exception of one or two small purchases, and a few trifling sales, they discontinued this branch of the business, but continued the other branch of it. On the 8th of July, 1842, they committed an act of bankruptcy: *Held*, that they must be considered traders [within the meaning of the bankrupt act of August 19, 1841, (5 Stat. 440, c. 9)] at the time they committed the act of bankruptcy.

[As to who are "merchants," within the meaning of the act of 1841, see Wakeman v. Hoyt, Case No. 17,051; In re Eeles, Id. 4,302; Everett v. Derby, Id. 4,576; Hall v. Cooley, Id. 5,928.]

2. The giving a mortgage of the whole of the bankrupt's estate and effects to a particular creditor, to hinder and delay the general creditors, is an act of bankruptcy, within the express terms of the statute. [Act Aug. 19, 1841, (5 Stat. 440, c. 9.)]

In bankruptcy. This was an application [by Ephrahim Baldwin against Lewis Rosseau and Charles Easton] for a decree in bankruptcy at the instance of a creditor. The case came before the court upon petition and answer, and the evidence taken before a commissioner. [Application granted.]

It appeared that the respondents had for several years been engaged in the business of planing and dressing deals, on a large scale, at their establishment for that purpose, at West Troy, in the county of Albany, and that the principal part of the materials wrought by them belonged to other persons; but until the close of navigation in the autumn of 1841, they had also been in the practice of purchasing, manufacturing and selling on their own account. At that time, with the exception, at most, of one or two small purchases, and a few trifling sales in the course of the ensuing winter and spring, they discontinued this latter branch of their business, but continued the other branch of it as usual. For several years past, Grant, Silliman and A. J. Rosseau had been their endorsers for the purpose of enabling them to obtain money to be used in the prosecution of their business, and at the time of the commission of the alleged act of bankruptcy, stood responsible as their endorsers for between $5,000 and $6,000, and were also their creditors to the amount of about $800 for money loaned. They were also largely indebted to others. The debt of the petitioning creditors was for a steam engine sold by him to them to be used in propelling their machinery, while they were fully engaged in carrying on both branches of their business. Shortly before the alleged act of bankruptcy, the respondents, finding themselves unable to meet their pecuniary engagements, proposed to their creditors, by some of whom suits had already been commenced, to secure their respective claims by giving a mortgage payable at a future day, on all their property, which they estimated to be worth $28,000; being several thousand dollars more than the whole amount of their indebtedness, including the responsibilities of Silliman, Grant and A. J. Rosseau, as their endorsers. But they insisted, however, on securing to their endorsers an absolute priority of payment, on the ground that they were under engagements to them to this effect, which they were not at liberty to disregard. Their other creditors were willing to grant them an extension of the time of payment, provided they should be placed on a footing of equality with the endorsers; but they refused to acquiesce in the condition of having a priority of payment secured to the endorsers. The respondents thereupon, on the 8th of July last, executed to Silliman, Grant and A. J. Rosseau a mortgage, payable in presenti, for $5,936.93, of all their real estate, consisting of the land on which their buildings and machinery were situated, and several other lots of ground, and including also several articles of personal property. They have ever since continued in the undisturbed possession and use of the mortgaged property, real and personal. It did not appear that they had any other personal property, except their household furniture. The execution of this mortgage constituted the alleged act of bankruptcy.

The case was ably argued.

Goodwin and Litchfield, for petitioning creditor.

Myers and Wright, for respondents.

CONKLING, District Judge, delivered the opinion of the court, and established the following points:

1. That as, for several years antecedent to the autumn of 1841, the respondents had confessedly been largely engaged in the business of buying and selling, and had then only ceased to do so, without any unequivocal act evincing their determination not to resume the business, they might properly be considered, under the circumstances of the case, as still being traders at the time of the alleged act

of bankruptcy. Such was the clear import of the decisions in the English courts.

2. That if they were not to be considered as being at that time traders in fact, so as to be liable to compulsory proceedings under the bankrupt 'act, in respect of debts then or thereafter contracted, yet, in as much as the act of bankruptcy charged against them the debt of the petitioning creditor, and their other debts all had their origin while they were using the trade of merchandise, they were on this ground to be treated as merchants in this proceeding. It is true the words "being merchants, or using the trade of merchandise," are in the present tense. But the act [of August 19, 1841, (5 Stat. 440, c. 9)] in this intent is precisely the same as the English acts, and yet these acts, as the cases cited on the argument clearly show, are unequivocally held to embrace cases like the present, even though the debtor may be shown to have left off trading long before the alleged act of bankruptcy. This is a reasonable construction of the act, and in accordance with its spirit. The opposite construction would lead to its evasion and the defeat of its objects.

3. Admitting it to be doubtful whether, in giving the preference secured by the mortgage, the respondents are to be considered as having acted "in contemplation of bankruptcy," still the mortgage is, under all the circumstances, to be adjudged fraudulent in law as having been given for the purpose of hindering and delaying creditors, and as such an act of bankruptcy, within the express terms of the first section of the act. Had the mortgage embraced only a part of the property of the respondents, it might perhaps have been regarded as a mere act of preference, and not an act of bankruptcy, unless executed in contemplation of bankruptcy. But it was made to cover all their real property, consisting of several other distinct pieces of land in addition to the land on which their buildings and machinery were situated, and also personal effects of considerable value. The property thus conveyed, according to the respondents' valuation, was worth more than four times the amount of all claims which the mortgagees had upon them, and clearly evinces an intention to hinder and delay the other creditors, and especially those who had already instituted suits against them. The inference is irresistible, moreover, that it was agreed, or at least tacitly understood, between the parties to the mortgage, that the respondents should continue in the possession of the property, both personal and real, as in fact they did. This is also a badge of fraud; and in this respect there is no difference between a mortgage and an absolute sale. The whole current of decisions, from Twyne's Case [3 Coke, 80, 1 Smith, Lead. Cas. 1] downward in England, and also in this country, properly understood, is believed to be in accordance with this view of the case.

In concluding his opinion, his honor remarked, that it was due to Messrs. Rosseau and Easton, under all the circumstances of the case as they appeared before the court, to remark, that it by no means followed from anything he had intended to say 'that they designed to commit any actual fraud upon their creditors. Their intention, desire and hope seemed to have been ultimately to pay all they owed; and it appeared to be questionable, at least, whether the ultimate interests of their creditors would not have been better promoted by leaving them to prosecute their efforts for this purpose, as, up to the present time, they have been doing.